**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**DAVID M. ZENT**
Leonard, Hammond, Thoma & Terrill
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RYAN D. JOHANNINGSMEIER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| TYSON A. HUDSON, )<br>)<br>Appellant-Defendant, )<br>)<br>vs. )<br>)<br>STATE OF INDIANA, )<br>)<br>Appellee-Plaintiff. ) | No. 02A03-1305-CR-178 |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable John F. Surbeck, Jr., Judge
Cause No. 02D06-1112-FC-390

**December 31, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Judge**

**Case Summary**

Tyson A. Hudson was convicted of battering his pregnant girlfriend. He now appeals arguing that the evidence is insufficient to support his convictions for Class C felony battery on a pregnant woman and Class A misdemeanor domestic battery. Finding the evidence sufficient, we affirm.

**Facts and Procedural History**

The facts most favorable to the verdicts are as follows. On December 2, 2011, Hudson and Kenyota Pickett had been in a relationship for over six years and lived together in a Fort Wayne apartment. They had a five-year-old son, and Kenyota was pregnant with their second child.[1]

At some point on the evening of December 2, Hudson and Kenyota began arguing about taking Hudson's "sister" home.[2] The argument started in the dining room but moved to the bedroom to get away from Hudson's "sister." The argument escalated in the bedroom. Hudson jumped on Kenyota; kicked her; pulled her hair, causing some hair plugs to come out; and choked her by placing his hands around her neck, causing her to almost lose consciousness. Tr. p. 71, 106, 137, 159; State's Ex. 2.

When Kenyota stood up, she ran toward the door and opened it, but Hudson stopped her. They went outside, and Hudson put Kenyota in the car even though Kenyota did not want to go anywhere. Tr. p. 72. Kenyota was forced to stay in the car because the

---

[1] Kenyota was seven months pregnant at trial—February 28, 2012. Tr. p. 2, 68. Working backward, Kenyota was between four and five months pregnant on December 2, 2011. In any event, Hudson knew that Kenyota was pregnant because he went with her to the Hope Center when Kenyota took a pregnancy test.

[2] This person was not Hudson's sister but rather someone he referred to as his sister. Tr. p. 70.

2

passenger door did not work. While in the car, Kenyota called her mother, Kimberly Pickett. *Id.* at 136. Kimberly could hear that Kenyota was crying and upset. *Id.* When Kimberly asked Kenyota if everything was okay, Kenyota said that she and Hudson had gotten into an argument. Kimberly started to ask more questions, but Kenyota hung up. Kimberly called back and asked Kenyota if she was okay; Kenyota said no, but she did not want to talk about it. *Id.* Kenyota told her mother that she and Hudson were taking his "sister" home. *Id.*

After Hudson dropped off his "sister," he and Kenyota returned to their apartment. Kenyota went to sleep but was soon awakened by Hudson arguing with her again. *Id.* at 73. Kenyota got the car keys and left for her mother's house. When Kenyota got to her mother's house, she stayed outside and talked to Hudson on the phone. *Id.* at 74. Hudson coaxed Kenyota to come back home. When Kenyota arrived at their apartment, she stayed in her car on the phone and continued to argue with Hudson. Eventually, Kenyota went inside and fell asleep.

Kimberly called her daughter the following morning, December 3. Kimberly asked Kenyota if she would like to go to lunch. Kenyota agreed and went to her mother's house. When Kenyota arrived, Kimberly immediately noticed "a big bruise on her forehead" and "scratches around her neck." *Id.* at 137. Kenyota also showed Kimberly her hair where three hair plugs were missing. *Id.* Kenyota, who was upset and crying, told her mother that Hudson had "jumped on" her and "grabbed her neck and held her down on the floor by her head on the carpet and maybe even kicked her and choked her and was pulling her hair." *Id.* This caused Kimberly to cry. Kimberly immediately called Kenyota's father,

Kenneth Brown, but because she could not get a hold of him, Kimberly, Kenyota, and some family members went out to lunch.

About an hour later, Kenneth called Kimberly, and Kimberly handed the phone to Kenyota. After the phone call, Kenneth, Kimberly, and Kenyota planned to go to Kenyota's apartment and call the police. *Id.* at 138. But when Kenyota hesitated, Kenneth went to the apartment by himself. *Id.* at 138, 147. Kenneth waited outside the apartment door and could hear Hudson threatening Kenyota over the phone. Specifically, Hudson called Kenyota a "bit**" and told her that if she did not come home soon, "there would be consequences." *Id.* at 148. Upon hearing this, Kenneth entered the apartment, startling Hudson. The two men started yelling at each other. Kenneth asked Hudson what happened to Kenyota, and Hudson responded that he and Kenyota had been "rough housing" and Kenyota fell off the bed. *Id.* at 151. Kenneth did not believe Hudson and warned Hudson that he had "five seconds" before he "was going to blow his head off." *Id.* Kenneth, however, did not have a gun with him. According to Kenneth, Hudson quickly "retracted his story" and admitted to inflicting "some violence" on Kenyota. *Id.* at 148, 151.

In the meantime, Kenyota drove to her apartment to find her father and Hudson there. *Id.* at 79, 141. Fort Wayne Police Department Officer James Chambers was dispatched to the apartment because of a 911 call and arrived shortly after Kenyota. *Id.* at 80, 116. Officer Chambers went inside the apartment and spoke with Hudson and Kenyota together. Officer Chambers described Kenyota as "very timid," "scared," and "[q]uiet." *Id.* at 118. Officer Chambers left the apartment without making any arrests.

4

About thirty minutes later, when Hudson had left the apartment, Kenyota and her mother called 911. Officer Chambers was dispatched back to the apartment. *Id.* at 80, 119. When Officer Chambers arrived the second time, Kimberly was still "scared" and "very timid." *Id.* at 119. This time, though, Officer Chambers had a more in-depth conversation with Kenyota. *Id.* Kenyota told Officer Chambers that she did not say anything during his first visit because she was scared of Hudson. *Id.* Officer Chambers observed abrasions on Kenyota's neck and an abrasion on her forehead. *Id.* at 120. Officer Chambers took pictures. *See* State's Ex. 7-9. Kenyota told Officer Chambers that Hudson inflicted the injuries. Tr. p. 121-22.

Several days later, on December 7, Kenyota met with Officer Robert Warstler, who was working with the domestic-violence unit at the time. Kenyota told Officer Warstler that Hudson had choked her, and she demonstrated how Hudson's hands were around her neck. *Id.* at 159. Kenyota also told Officer Warstler that she felt she was going to lose consciousness and that Hudson told her "you are going to die," at which point they fell from the bed to the floor. *Id.*

The State charged Hudson with Class C felony battery on a pregnant woman, Class D felony strangulation, and Class A misdemeanor domestic battery. Before trial, the State dismissed the strangulation charge.

At Hudson's jury trial, Kenyota testified to a different version of events. According to Kenyota, she became injured because Hudson "was holding me and trying to stop me from hitting him, so we were like tussling . . . on the floor and I ended up getting a carpet burn on my forehead." *Id.* at 71. As for the scratches on her neck, Kenyota explained it

5

this way: "I guess he tried to cover my mouth but his hands ended up around my neck and I guess it slipped off my chain too . . . ." *Id.* Kenyota said that she called 911 the second time because she wanted to get away from Hudson at the time and felt pressured to do so because the officer told her she was risking custody of her children if she continued to have a relationship with Hudson. *Id.* at 101-03. Kenyota admitted that she and Hudson were "still madly in love" but maintained that what she told people earlier about the incident was untrue. *Id.* at 104-05.

The jury found Hudson guilty of Class C felony battery and Class A misdemeanor domestic battery. The trial court sentenced Hudson to an aggregate term of five years with two years suspended. Sent. Tr. p. 15-16.

Hudson now appeals his convictions.

**Discussion and Decision**

Hudson contends that the evidence is insufficient to support his Class C felony battery and Class A misdemeanor domestic-battery convictions.[3] When reviewing a challenge to the sufficiency of the evidence underlying a criminal conviction, we neither reweigh the evidence nor assess the credibility of witnesses. *Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012). The evidence—even if conflicting—and all reasonable inferences drawn from it are viewed in a light most favorable to the conviction. *Id.* "[W]e affirm if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." *Id.*

---

[3] We note that Hudson does not raise a double-jeopardy violation.

In order to convict Hudson of Class C felony battery on a pregnant woman as charged here, the State had to prove that he knowingly or intentionally touched Kenyota, who was pregnant and Hudson knew to be pregnant, in a rude, insolent, or angry manner, resulting in bodily injury to Kenyota. Ind. Code § 35-42-2-1(a)(8); Appellant's App. p. 15. In order to convict Hudson of Class A misdemeanor domestic battery as charged here, the State had to prove that he knowingly or intentionally touched Kenyota, with whom he had a child in common, in a rude, insolent, or angry manner, resulting in bodily injury to Kenyota. Ind. Code § 35-42-2-1.3(a)(1); Appellant's App. p. 17.

Hudson only challenges the sufficiency of the evidence for two elements. That is, Hudson argues that the State failed to prove beyond a reasonable doubt that he knowingly and intentionally touched Kenyota and that he caused bodily injury to Kenyota. Appellant's Br. p. 9. According to Hudson, he "does not dispute the additional elements within the charging informations." *Id.*

"A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." Ind. Code § 35-42-2-2. "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." *Id.* Hudson argues that it "was neither [his] conscious objective to batter [Kenyota], nor was he aware of a high probability that he was doing so." Appellant's Br. p. 9. Hudson points to Kenyota's trial testimony that Hudson was holding her to prevent her from hitting him, which caused the carpet burn to her forehead. He also points to Kenyota's trial testimony that he was only trying to cover her mouth and that the injury to Kenyota's neck was the result of his hands slipping.

7

The evidence most favorable to the verdicts shows that Hudson knowingly touched Kenyota, resulting in bodily injury to her. Kenyota's mother, Kimberly, testified at trial—without objection—that Kenyota told her that Hudson had jumped on her, grabbed her neck, held her down by her head on the carpet, kicked her, choked her, and pulled her hair. Tr. p. 137. Kimberly observed a large bruise on Kenyota's forehead, scratches on her neck, and missing hair plugs. Officer Chambers testified at trial—without objection—that during his second visit, he observed abrasions on Kenyota's neck and an abrasion on her forehead. *Id.* at 120. Officer Chambers took pictures. *See* State's Ex. 7-9. Officer Chambers testified that Kenyota told him that Hudson inflicted the injuries. Tr. p. 121-22. Likewise, Officer Warstler testified at trial—without objection—that Kenyota told him that Hudson had choked her, and she demonstrated how Hudson's hands were around her neck. *Id.* at 159. Kenyota also told Officer Warstler that she felt she was going to lose consciousness and that Hudson told her "you are going to die," at which point they fell from the bed to the floor. *Id.* This evidence is sufficient to prove that Hudson knowingly touched Kenyota, resulting in bodily injury to her.

As for Hudson's other arguments—including that Kenyota testified to a different version of events at trial, the police left the apartment the first time without arresting anyone, and Kenyota felt pressured to pursue charges against Hudson to maintain custody of her children—these are merely requests to reweigh the evidence. We therefore affirm Hudson's convictions for Class C felony battery and Class A misdemeanor domestic battery.[4]

---

[4] Because of this resolution, we do not need to address the State's cross-appeal issue that the trial court erred by allowing Hudson to file a belated notice of appeal.

8

Affirmed.

RILEY, J., and MAY, J., concur.